UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE SMALL, | |
| Plaintiff, | |
| v. | Civil Action No. 04-12210-NG |
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, | |
| Defendant. | |

### DEFENDANT MASSACHUSETTS INSTITUTE OF TECHNOLOGY'S
### OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

Defendant Massachusetts Institute of Technology ("MIT") respectfully submits this Opposition to the Motion to Compel ("Motion") filed by plaintiff Denise Small ("Plaintiff"). This Court should deny Plaintiff's Motion in its entirety. Many of Plaintiff's discovery requests at issue in the Motion improperly seek confidential information from the personnel files (or, in some cases, the entire personnel files) of numerous current and former MIT employees, none of whom are parties to this case, and Plaintiff has failed to show a need for this information that outweighs the individuals' legitimate privacy interests. Further, Plaintiff's request for MIT's affirmative action plans is improper, as they are not called for by the discovery request at issue and in any event are wholly irrelevant to her claims and not reasonably calculated to lead to discoverable evidence. Consequently, for the reasons set forth more fully below, Plaintiff's Motion should be denied.

### Relevant Factual Background[1]

Plaintiff began working for MIT as a Senior Secretary in the Harvard-MIT Division of

---

[1] This summary is for background purposes only. Specific factual recitations relevant to the discovery requests at issue are set forth in the Argument section, with appropriate references to the record.

Health Sciences and Technology ("HST") in 1998. In this position, Plaintiff provided part-time secretarial, grant and research account support for one Principal Investigator ("PI") in HST, as well as part-time grant and research account support for several other PIs. As set forth in the job description for her position, Plaintiff worked for multiple PIs but the Administrative Officer ("AO") for HST was her immediate supervisor.

Among Plaintiff's job requirements was assisting the PI's whom she supported with the administration of their grants. Until July 2000, Plaintiff performed miscellaneous tasks in support of a Biomedical Internship Program that was funded by a grant that had been awarded to Dr. Gray. When these responsibilities ended, Dr. Gray asked her to take on some temporary, and minor, tasks that had been performed by another HST secretary who was on medical leave. These tasks (which Plaintiff assumed for only two or three weeks) consisted of checking one PIs mail and providing minimal assistance to another PI. Dr. Gray believed that the assumption of these tasks would be a routine undertaking and that Plaintiff had the time to perform them. To confirm this, and in order to understand the allocation of how Plaintiff was, in fact, devoting her workplace efforts, Dr. Gray asked Plaintiff to compile brief, summary work logs for three separate weeks in July and August 2000.

In addition to the tasks that her supervisors asked her to perform, Plaintiff assumed some additional responsibilities that were neither required nor requested by her supervisors. Plaintiff also sought a substantial amount of overtime pay for performing that work. Although Plaintiff violated HST policy by working overtime without first obtaining authorization to do so, she was nonetheless given overtime pay for all overtime hours that she reported.

In November 2001, Maria Judge began her new job as AO for HST. During the first few months of her employment, Ms. Judge scheduled meeting with approximately 30 to 40 members

of HST, as she was endeavoring to meet as many members of HST as she could, and in particular those that reported to her, so that she could obtain an understanding of how HST worked. However, when Ms. Judge attempted to meet with Plaintiff, Plaintiff refused to meet with Ms. Judge, refused to provide Ms. Judge with a job description (which Plaintiff claimed was different from the job description that Ms. Judge had obtained from the HST Personnel Administrator), and turned what should have been a perfunctory meeting into a prolonged, six-week process in which Plaintiff repeatedly refused to meet with Ms. Judge, even after being told that doing so was a job requirement. Because of her flagrant insubordination, MIT reasonably terminated Plaintiff's employment as of March 7, 2002.

## Argument

## I.    PLAINTIFF IS NOT ENTITLED TO SENSITIVE PERSONNEL INFORMATION REGARDING INDIVIDUALS WHO ARE NOT EVEN PARTIES TO THIS CASE.

The majority of Plaintiff's discovery requests at issue in the Motion concern Plaintiff's requests for sensitive personnel information. In multiple Interrogatories and Document Requests (Interrogatories No. 1 and 3, and Requests No. 9, 10, 16 and 17), Plaintiff seeks confidential information from the personnel files of numerous current and former employees of HST. Plaintiff is not entitled to this information simply because she desires it, but rather she must articulate its relevance with reference to her claims. *Cf. In the Matter of Roche*, 381 Mass. 624, 636-37 (1980) (in exercising control over discovery, courts should be "particularly sensitive to preventing exposure 'for the sake of exposure'") (citations omitted).

Moreover, it is well settled that individuals have a heightened privacy interest in the documents in their personnel files. *See, e.g., Whittingham* v. *Amherst College*, 164 F.R.D. 124, 127-128 (D. Mass. 1995) (recognizing that "personnel files contain perhaps the most private information about an employee within the possession of an employer"). Consequently, "because

3

there is a high expectation of privacy in a personnel file, the release of information from a personnel file is also a substantial interference with the right to privacy." *Fitzgerald* v. *Morrison*, 2002 WL 389872, at *1 (Mass. Super. Jan. 10, 2002) (quoting *Skelley* v. *Trustees of the Fessenden School*, 1994 WL 928172, 7 Mass. L. Rptr. 414, 418 (1994)); *see* G.L. c. 149, § 52C.    In accordance with this heightened expectation of privacy,  Plaintiff must further show that the relevance of these individuals' personnel files outweighs the serious intrusion on privacy rights that would be inherent in their disclosure. *See Whittingham*, 164 F.R.D. at 127-28 (noting that "while discovery is usually broad, Plaintiff has not demonstrated that the files he seeks, even if marginally relevant, outweigh the privacy interests of these individuals" and collecting cases rejecting requests to discover personnel files); *Fitzgerald* at *1.

The confidentiality agreement that the Parties stipulated to in this case does not resolve the privacy concerns relating to Plaintiff's intrusive discovery requests.  By its terms, the confidentiality agreement addresses only the manner in which Plaintiff can use certain information disclosed to her in the course of discovery.  It does not resolve, or even address, the substantial invasion to the non-parties' privacy interests inherent in the disclosure of sensitive information from their personnel files to Plaintiff herself.  Further, it does not fully address the possible invasion of non-parties' privacy interests in the event that Plaintiff subsequently seeks to introduce any such information at trial, if any.  Thus, as set forth in detail below, because Plaintiff has not made the showing necessary to justify the disclosure of the sensitive personnel information requested, her Motion should be denied to the extent it seeks such information, notwithstanding the existence of the confidentiality agreement.

A.    Plaintiff's requests for the complete personnel files, or information therefrom, of other black employees who have been terminated from MIT and other employees who have been subject to any disciplinary action are overbroad, irrelevant to her claims and improperly seek to intrude on the privacy of individuals who are not parties to this case.

In Interrogatory No. 3 and Document Requests No. 9 and 10, Plaintiff seeks the complete personnel files, or (with respect to the Interrogatory) information from the personnel files of all employees of HST who have been subject to any disciplinary action and all black employees who have been terminated, voluntarily or involuntarily, from HST during the time period of 1999 through 2002. Although Plaintiff purportedly seeks this information to compare herself to other employees, Plaintiff is entitled to compare herself only with those who were similarly-situated to her. *See Whittingham*, 164 F.R.D. at 127-28 (rejecting motion to compel discovery of personnel files and attendant private information about college employees who held positions other than plaintiff's); *cf. Conward v. Cambridge School Committee*, 171 F.3d 12, 20 (1st Cir. 1999) (stating that in employment discrimination cases, "apples should be compared with apples") (internal quotation and citation omitted); *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129-30 (1997) (proposed comparators must be like plaintiff "in all relevant respects" and "similarly situated in terms of performance, qualifications and conduct, without such differentiating or mitigating circumstances that would distinguish their situations"). Plaintiff was disciplined and eventually terminated because she repeatedly failed to attend a routine meeting with one of her supervisors. *See* Defendant Massachusetts Institute of Technology's Answers to Plaintiff's Second Set of Interrogatories, at 4. She has made no showing that any other employee has been involuntarily terminated for a similar reason.[2] Accordingly, absent a showing that other

---

[2] Further, Plaintiff's request (in Request No. 9) for the personnel files for black employees who terminated their employment with MIT voluntarily plainly is improper, as these individuals were not in any way similarly-situated to Plaintiff, who was terminated involuntarily.

employees engaged in conduct similar to that for which Plaintiff was terminated, she is not entitled to discover confidential personnel documents concerning individuals whose employment with MIT has been terminated. *See Whittingham*, 164 F.R.D. at 127 (finding that where "Plaintiff has made no real showing that [other] individuals suffered similar treatment . . . Plaintiff is not entitled to discovery").

Similarly, Plaintiff has identified no other HST employee who was disciplined for engaging in the type of conduct Plaintiff engaged in, i.e., refusing to meet with one of her supervisors as repeatedly instructed. Plaintiff has elicited no evidence, and the Motion surely contains none, to suggest that other employees were disciplined for refusing to meet with their supervisors. Indeed, the HST employees that Plaintiff identifies in the Motion were disciplined for different reasons, and therefore were not similarly-situated to Plaintiff. For example, Andre Rolle was disciplined for issues relating to "attendance, tardiness, [and] performing job responsibilities" prior to his resignation[3] from MIT. Deposition of Maria Judge, excerpts attached at Tab A, at 21. As with her requests for the personnel files of other employees who have been terminated from HST, Plaintiff has made no showing (or even alleged) that other individuals were disciplined for infractions similar to that which Complainant was disciplined for. Thus, she is not entitled to access to sensitive documents from the personnel files of other MIT employees, let alone the entire files. *See Whittingham*, 164 F.R.D. at 127. Accordingly, Plaintiff's requests for discovery of the complete personnel files, or information therefrom, of other employees who have been subject to disciplinary action and/or whose employment with MIT has terminated should be denied.

---

[3] Plaintiff incorrectly cites the deposition testimony of Terrill Gadde for the proposition that Mr. Rolle was terminated involuntarily from MIT. Motion at 10. However, as Ms. Judge, who was Ms. Rolle's supervisor, testified clearly, Mr. Rolle in fact resigned from MIT and was not terminated. *See* Deposition of Maria Judge at 22. Ms. Gadde's mistaken testimony will be corrected through an errata sheet.

B.    Plaintiff's request for work logs and overtime records for other employees bears no relevance to her claims and her desire for such information plainly does not outweigh the legitimate privacy interests of the non-party individuals involved.

Plaintiff's request for work logs and overtime records should be denied because her marginal interest in the information does not outweigh the individuals' privacy interests. In this case, although Plaintiff alleges that she purportedly was "denied" overtime, she has admitted that the supposed "overtime" that she was denied relates solely to one week in August 2000, in which she admittedly worked overtime hours without first obtaining authorization from her supervisors, in violation of MIT policy. *See* Deposition of Denise Small, excerpts attached at Tab B, at 202-04, 207. Notwithstanding her violation of MIT policy, Plaintiff also admits that she was paid for all overtime hours that she worked in August 2000. *Id.* at 208-09. Thus, the purported "denial" of overtime to Ms. Small in 2000 is not even a cognizable "adverse employment action," and the trivial nature of her overtime claim does not justify the intrusion into the privacy of other HST employees, who are not parties to this case, for discovery of their payroll records. *See Noviello* v. *City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005) ("[t]ypically, an adverse action involves a discrete change in the terms and conditions of employment (say, a discharge, demotion or reduction in pay)"); *MacCormick* v. *Boston Edison Co.*, 423 Mass. 652, 662-63 (1996) (adverse employment action requires some "disadvantage in respect to  . . . salary, grade, or other objective term or condition of employment"). Further, contrary to Plaintiff's misleading characterization of MIT's interrogatory answer addressing this topic, MIT has not stated that it cannot recall *whether* any other employees worked a material amount of overtime without obtaining prior authorization, but rather clearly stated that it could not recall any employees, other than Plaintiff, who worked such material overtime without prior authorization. *See* Defendant Massachusetts Institute of Technology's Answers to Plaintiff's Second Set of Interrogatories, at 6. Thus, Plaintiff's speculative desire to rummage through payroll records of

other employees, for the purposes of finding purported evidence to support a non-cognizable claim, does not outweigh the non-parties' legitimate privacy interests in avoiding the disclosure of their payroll records to Plaintiff.

Similarly, Plaintiff has requested the work logs of other employees in HST. However, she has admitted that Dr. Gray, the co-director of HST, asked her to create work logs on only three occasions in the summer of 2000, that she does not view the first two requests as unfair, and that the each work log took Plaintiff all of 25-35 minutes to complete. *See* Deposition of Denise Small, at 194-201. As with her claim for the purported "denial" of overtime, Plaintiff's allegation that she was asked to prepare three work logs does not amount to a cognizable "adverse employment action" and certainly does not justify her attempts to invade the privacy of other HST employees to obtain documents from their personnel files. Moreover, Dr. Gray already has testified that no other support staff employee in HST was asked to create a work log in the relevant time period, but rather that she asked a lab technician and some students to create similar work logs. *See* Deposition of Martha Gray, excerpts attached at Tab C, at 64. Plaintiff cannot argue that a lab technician or a student are similarly-situated to her, and thus her request for work logs prepared by these individuals should be denied for this independent reason. *See Whittingham*, 164 F.R.D. at 127-28 (rejecting motion to compel discovery of personnel files).

C.   Plaintiff's request for termination information and contact information of all HST support staff employees is improper.

In its initial disclosures, MIT provided Plaintiff with a list of individuals who it considered to have discoverable information concerning Plaintiff's claims. However, in Interrogatory No. 1, Plaintiff now seeks detailed information, including the reason for termination (if applicable), for all HST employees from 1999 through 2002. Through discussions between counsel, Plaintiff has agreed to limit this request to HST support staff

8

employees (and not faculty or staff), but nevertheless the Interrogatory still is overbroad and seeks unnecessarily to intrude on the privacy of individuals who are not parties to this case. Particularly with respect to information concerning termination, Plaintiff has made no showing that any other HST support staff employee has been terminated for reasons remotely similar to the reason why MIT terminated her employment, and thus her efforts to obtain sensitive information from others' personnel files should not be permitted. *See Whittingham*, 164 F.R.D. at 127-28. Similar to her other overly intrusive discovery requests, Plaintiff has made no showing that any the information sought bears any relation to the sole disputed issue in this case: the reason why she was disciplined and ultimately terminated. Consequently, Plaintiff has not justified an invasion of the privacy of current and former HST employees who are not parties to this case.

## II.    PLAINTIFF'S REQUEST FOR MIT'S AFFIRMATIVE ACTION PLAN SHOULD BE DENIED BECAUSE IT IS NOT CALLED FOR BY HER DISCOVERY REQUEST AND IN ANY EVENT IS WHOLLY UNRELATED TO HER CLAIMS.

In Plaintiff's Request No. 8, she requested all documents concerning HST's affirmative action policies or practices for the time period of 1999 to 2002. In response, MIT produced the policies concerning affirmative action and non-discrimination that applied to HST during the applicable time period, and otherwise properly objected to the request on grounds, among others, that it was overbroad and sought irrelevant information. However, Plaintiff now seeks MIT-wide affirmative actions plan in addition to the documents that already have been provided.

MIT-wide affirmative action plans are not responsive to Plaintiff's Request No. 8. By its express terms, the Request calls only for documents concerning "*HST's* affirmative action . . . policies or practices" and, significantly, does not request MIT's affirmative action policies and practices. Motion at 10 (emphasis added). Thus, Plaintiff's suggestion that the Request calls for MIT-wide affirmative actions plans based on the Court's uniform discovery definitions is

9

misplaced.  The appropriate inquiry is not, as Plaintiff incorrectly suggests, whether  MIT's affirmative action plans refer to, describe, evidence or constitute MIT's policies and practices on affirmative action.  *See* Motion at 11.  Rather, based on the plain text of Request No. 8, the appropriate question is whether HST's affirmative action policies and practices refer to, describe, evidence or constitute any MIT-wide affirmative action plans, and plainly they do not.  Regina Caines, who was MIT's Director of Affirmative Action, Equal Employment Opportunity and Diversity Programs during the relevant time period, testified clearly that HST did not prepare its own affirmative action plan, but rather any statistical data relating to HST was part of a compilation of information concerning the broader School under which HST's operations were organized.  *See* Deposition of Regina Caines, excerpts attached at Tab D, at 19 ("I did not collect data specific to HST for the affirmative action plan.  It would have been part of a compilation of information that came from their school.")  Therefore, because any statistics compiled[4] for the MIT-wide affirmative action plan would not be broken down to show data specific to HST, and MIT is not required to create such a document to respond to Plaintiff's overbroad request, there is no HST affirmative action plan that is responsive to Plaintiff's Request No. 8.

Plaintiff in this case has alleged that she experienced disparate treatment from her supervisors in HST, a relatively small department in an institution that employs thousands of individuals.  Although Plaintiff is entitled to use evidence of a pattern or practice of discrimination to prove her claims, such evidence lacks probative value if not contemporaneous with or related to her own claims of discrimination and, in particular, if it does not involve the

---

[4] To the extent Plaintiff's request could be construed as seeking information from any affirmative action plan beyond mere statistical or other objective information, such information, if any, is protected by the critical self-analysis privilege and thus beyond the scope of discovery.  *See Whittingham*, 164 F.R.D. at 129; *O'Connor* v. *Chrysler Corp.*, 86 F.R.D. 211 (D. Mass. 1980); Fed. R. Civ. P. 26(b)(1).

same decisionmakers.[5] *See Pedraza v. Holiday Housewares, Inc.*, 203 F.R.D. 40, 42 (D. Mass. 2001) (denying plaintiff's motion for leave to conduct more than twelve depositions in order to discover "pattern or practice" evidence, where the plaintiff did not allege or show that the same decision-makers were involved in other incidents of discrimination and his own). Plaintiff's attempt to discover MIT-wide information concerning its affirmative action plans cannot possibly shed any light on the alleged treatment she received from her supervisors in HST. Consequently, her request for MIT-wide affirmative actions plan is improper and should be denied.

## Conclusion

For the reasons set forth above, Plaintiff's Motion should be denied in its entirety.

> MASSACHUSETTS INSTITUTE OF
> TECHNOLOGY,
> By its attorneys,
>
> /s/ Robert Young
> Jeffrey Swope (BBO #490760)
> Robert G. Young (BBO #650541)
> EDWARDS ANGELL PALMER & DODGE LLP
> 111 Huntington Avenue at Prudential Center
> Boston, MA  02199-7613
> 617.239.0100

Dated: February 22, 2006

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on February 22, 2006.

/s/ Robert Young

---

[5] While Plaintiff cites case law for the general proposition that courts may consider evidence of an employer's general practice and policies regarding employment of minorities, the cases she cites do not address the shortcomings of Plaintiff's discovery requests at issue as set forth in this Opposition, and thus are not persuasive authority for the overbroad and irrelevant discovery that Plaintiff seeks.

**Tab A**

1

Volume I
Pages 1 to 128
Exhibits 42 to 58

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
DENISE SMALL,                   :
              Plaintiff,        :
                                :
         vs.                    :  Civil Action No.
                                :  04 12210 NG
MASSACHUSETTS INSTITUTE OF      :
TECHNOLOGY,                     :
              Defendant.        :
                                :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF MARIA S. JUDGE, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Susan
J. Cataldo, Professional Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Hale and Dorr Legal
Services Center of Harvard Law School, 122 Boylston
Street, Jamaica Plain, Massachusetts, on Thursday,
January 5, 2006, commencing at 10:03 a.m.

PRESENT:

    Hale and Dorr Legal Services Center of
        Harvard Law School
        (by Stephen S. Churchill, Esq.)
        122 Boylston Street,
        Jamaica Plain, MA 02130, for the Plaintiff.

    Edwards Angell Palmer & Dodge LLP
        (by Robert  G. Young, Esq., and
        James Hlawek, Esq.)
        111 Huntington Avenue,
        Boston, MA 02199,
        for the Defendant.

                *  *  *  *  *

1  someone else's direct report without working through
2  them.
3      Q.   Okay.  During the time you worked as
4  administrative officer, what employees did you have
5  to take disciplinary action against?
6          MR. YOUNG:  Objection.
7      A.   As best I can recall, three.
8      Q.   Who were they?
9      A.   One was Denise Small.  One was Andre Rolle,
10 and actually the third person was a former employee
11 who had come back on a temporary basis, so -- I'm
12 just trying to think of her name.  Carol -- I can't
13 remember her name.  She had a hyphenated last name.
14     Q.   Gibbs-Henderson?
15     A.   Yes.
16     Q.   So it was Carol Gibbs-Henderson.
17     A.   Yes.  Is she in here?
18     Q.   Okay.  And what type of action did you take
19 against Mr. Rolle?
20         MR. YOUNG:  Objection.  You can answer.
21     A.   We were working through the policies and
22 procedures for I think they called it corrective
23 action related to attendance, tardiness, performing
24 job responsibilities.

22

1      Q.    And did you ever take any action against

2   Mr. Rolle either in terms of a warning or a

3   termination or anything like that?

4           MR. YOUNG:  Objection.

5      A.    We -- I don't recall the exact -- there

6   were several written documents.  I don't recall

7   exactly which ones were which step of the process,

8   but we had gone through a couple of steps in the

9   process.  I would say at least one was a warning.

10      Q.    Did Mr. Rolle leave HST while you were

11   working as administrative officer?

12      A.    Yes, he did.

13      Q.    And why did he leave?

14           MR. YOUNG:  Objection.

15      A.    I don't recall the exact details, but he

16   came to us and told us during the period that we

17   were in the disciplinary process that he had decided

18   that he would prefer to leave rather than continue

19   to work at HST.

20      Q.    When did he leave?

21      A.    I don't recall exactly.  I believe it was

22   around December of 2002 or January of 2003, as best

23   I can recall.

24      Q.    Other than you who else played a roll with

**Tab B**

1                                    VOLUME: I

2                                    PAGES: 1-242

3                                    EXHIBITS: 1-22

4

5                    COMMONWEALTH OF MASSACHUSETTS

6                  COMMISSION AGAINST DISCRIMINATION

7

8      - - - - - - - - - - - - - - - - x

9      DENISE SMALL,

10                        Complainant,

11       v.                                Civil Action

12     MASSACHUSETTS INSTITUTE OF           No. 02-BEM-00490

13     TECHNOLOGY, MARTHA GRAY, MARIA

14     JUDGE, and TERRIL GADDE,

15                        Respondents.

16     - - - - - - - - - - - - - - - - x

17              DEPOSITION of DENISE MARIA SMALL

18                      July 1, 2003

19                      10:15 a.m.

20                    Palmer & Dodge

21                  111 Huntington Avenue

22                  Boston, Massachusetts

23

24        Reporter: Michael D. O'Connor, RPR

LEGALINK BOSTON
(617) 542-0039

1    additional job responsibilities?

2        A.    I believe it ended at some point.  I think

3    it may have ended in August.  I think I took these

4    responsibilities for only three weeks.  Two or three

5    weeks.  I'm not sure.

6        Q.    So is it your sworn testimony you only did

7    these additional responsibilities for two or three

8    weeks?

9        A.    I know it wasn't more than a month.

10        Q.    And that you were no longer performing

11    these additional responsibilities then by August 28,

12    2000?

13        A.    Yes, I would have to say that.

14            (Recess)

15      BY MR. BECKER:

16        Q.    Ms. Small, in your charge of discrimination

17    you also allege that Dr. Gray requested that you

18    create some work logs, correct?

19        A.    Yes.

20        Q.    Specifically I believe you claim in the

21    summer of 2000 she requested that you submit some

22    work logs to her; is that correct?

23        A.    Yes.  She asked for one week of work log at

24    the time.

1        Q.    And did you feel that this was evidence of
2    discrimination at the time?

3        A.    No, I did not, not at the time.

4        Q.    You say now, though, that this request is
5    discriminatory and is evidence of racial
6    discrimination, correct?

7        A.    It was evidence to me of discrimination
8    when she repeatedly kept asking me for the work
9    logs, and from what I was made to understand, the
10   work logs were to determine if overtime was needed
11   to provide the additional duties I had taken.

12            In the very beginning, Ms. Gray told me
13   that she did not express to me that it was going to
14   be an ongoing basis of me providing work logs.  I
15   thought it was a one-time request for her to
16   understand what I do on a day-to-day basis.  It is
17   the second time this request is being made to me,
18   from prior to the first time when she made the
19   request through Bob Malone of how my time is being
20   allocated.

21       Q.    The first request for you to create a work
22   log, that came in the summer of 2000?

23       A.    That's right.

24       Q.    And you did not believe that first request

1  was unfair?

2       A.    The first time, no.  When it was requested

3  for the allocation of my time, I didn't think it was

4  unfair.  I didn't see any motive behind it.  I

5  complied.

6            The second time she asked for the similar

7  request, I still didn't see any motive behind it.  I

8  complied.  It's when the request was made a third

9  time, and I wasn't sure how long.  It appeared to me

10  it was going to be an ongoing scenario.

11      Q.    That third request, was that made in August

12  of 2000?

13      A.    I believe it was.

14      Q.    But again, you believe it was not unfair

15  for her to request initially that you create a log

16  so that she could understand what you did on a

17  day-to-day basis, correct?

18      A.    Initially the first time, yes.

19      Q.    How many specific requests did she make of

20  you to create work logs?

21      A.    All together?

22      Q.    Yes.

23      A.    Between two or three.  Three, at least.

24      Q.    And it's your opinion that that third

1    request was unfair?

2         A.   Yes, I do.

3         Q.   Is it your testimony that you believed it

4    to be unfair at the time?

5         A.   Yes, it is.  I believed it to be unfair at

6    the time; yes, I did.

7         Q.   Did you believe it to be discriminatory at

8    the time?

9         A.   Yes, considering the nature and the reason

10   why the request was being made.  It was being made

11   to determine if overtime was needed to be done.

12   From what I understand, I don't know if any other

13   employees were provided or was requested to provide

14   work when they had done overtime in the past.  From

15   what I understand, that was not required of them.

16        Q.   Did you understand it to be racial

17   discrimination at the time that she made that third

18   request of you?

19        A.   Well, in my opinion, yes.  I didn't -- I'm

20   not aware of any Caucasian employees providing work

21   logs to show that overtime is needed.  I know

22   overtime was done when it was requested and when it

23   was needed.  I don't believe anyone did work logs,

24   because when we had an internal investigation, that

1    was not presented at the time to me, that justified

2    a reason for me doing work logs.

3        Q.   Do you believe Caucasian employees had to

4    report to their supervisors on how they spent their

5    workdays?

6        A.   I don't know.  I don't know how each

7    employee accounted their time to supervisors.  I

8    can't honestly answer that question.  I wasn't privy

9    to that information.

10       Q.   How much time did it take you to create

11   each work log?

12       A.   Well, I would basically try to do the work

13   log -- as she asked me to take down a little piece

14   of paper and to write down what I did on every hour,

15   whatever hour I was doing in whatever frame of time,

16   and I would try to do the work log.  It may take me

17   45, 35 minutes, because it all depends.  I would go

18   back to it back and forth and also try to do my

19   regular duties in between.  I had a lot of tasks I

20   had to accomplish.

21       Q.   Is it your testimony that it took you

22   between 35 and 45 minutes to create each of the work

23   logs you created?

24       A.   I can't say that it would take me 35 to 45

1    minutes, because it would vary.  It may take me --

2    it could have took me 25 to 30 minutes.  It varies.

3    I can't honestly give an accurate number.

4         Q.   So it could have taken you 25 to 35 minutes

5    to create a single work log; is that correct?

6         A.   It could have.  It could have.

7         Q.   And you were asked to create three separate

8    work logs, correct?

9         A.   Correct.

10        Q.   So is it fair to say that it took you, at

11   most, two hours to create these work logs?

12        A.   I wouldn't say it took two hours.  I

13   wouldn't say it took two hours.

14        Q.   How much time do you approximate it took

15   you to create all of these work logs in total?

16        A.   In total?

17        Q.   Yes.

18        A.   Well, each work log was done on different

19   sequences and each week was different for times and

20   tasks that I had to do.  I tried to squeeze in doing

21   the work logs in my daily routine, and combined all

22   together, it could have taken me maybe an hour and a

23   half, maybe an hour.  Maybe an hour and 45 minutes.

24   I'm guessing.

1          I never really tried to -- you know, I had

2     a work log to do, I had this to do, and so I never

3     really thought about counting the minutes of how

4     long the work log would take.  I think that would

5     have been a bit much trying to account for the time

6     it took to do the work log, much less having to do

7     the work log and figure out how long each task

8     takes.  That was a very tedious thing to be doing

9     during the course of the day, but nonetheless I did

10    it.

11         Q.   Is it your testimony it took you

12    approximately an hour and 45 minutes to create those

13    three work logs in total?

14         A.   I don't want to say it's the final

15    testimony.  I can't actually give you the exact -- I

16    can't say it's fact and grounded it took me an hour

17    and 45 minutes.  It could have taken less or it

18    could have taken longer.  This is almost two years

19    ago.

20         Q.   That's why I'm asking you, is it fair to

21    say it took you approximately an hour and 45 minutes

22    to create these three work logs?

23         A.   It could have.  I'm not comfortable saying

24    yes and I'm not comfortable saying no.

```
 1          Q.   I'm not asking you for an exact number.
 2     I'm asking you for an approximate number?
 3          A.   We can go with the approximate, then.
 4          Q.   Is it fair to say it took you approximately
 5     an hour and 45 minutes to create these three work
 6     logs?
 7          A.   I have to say yes, an hour and 45 minutes.
 8     I don't know.  Maybe.
 9          Q.   Is it fair to say it took approximately an
10     hour and 45 minutes to create the three in total?
11               MR. NOTIS:  I'm going to object.  The
12     witness has said she doesn't know.  She doesn't
13     recall.
14               MR. BECKER:  That's not what I heard.
15          Q.   I heard you can't recall with mathematical
16     precision of how many minutes it took, and I'm not
17     asking for that.  I just want clear testimony of
18     whether or not it's your testimony that it took you
19     -- let me ask you this.
20               Is it fair for me to say it took you
21     approximately one hour and 45 minutes to create
22     these three work logs in total?
23               MR. NOTIS:  Objection.  You can answer if
24     you can.
```

1          A.    I'm going to say again, and I understand
2    what you're asking me, but I cannot say that it took
3    me an hour and 45 minutes.  It could have.  It's
4    just hard to combine how long this work log took me
5    to do.  I did the work log during the course of a
6    day while I was given multiple tasks that I was
7    responsible for. I cannot give you an accurate
8    number.  I simply just can't.
9          Q.    Okay.  You also allege that you were denied
10   requests for overtime while white employees with
11   less work were not; is that true?
12         A.    That is true.
13         Q.    In your opinion, that's evidence of
14   discrimination?
15         A.    In my opinion, yes.
16         Q.    On how many instances were you denied
17   overtime?
18         A.    When I was given these additional tasks,
19   from the very beginning, when Martha gave me these
20   additional tasks in July, I expressed to Martha, I
21   said, In order to cover these additional PIs, I
22   would need to work overtime to be able to complete
23   all of my tasks that was required of me.
24              She, in turn, told me that the work logs

1    would show if overtime was needed.  I said, Okay,

2    and I did the work logs.

3          In the past before, when I did overtime,

4    other employees' overtime, I was never requested to

5    provide a work log.  Other employees were doing

6    overtime, the ones that I knew that I'm aware of,

7    and there could be others that I might not be aware

8    of right now or didn't see, but I'm going on what I

9    saw or what I observed and what I was told, and I

10   inquired with one particular employee was a work log

11   required, and they didn't have any knowledge of

12   that.  I don't know if it's okay for me to recall

13   names.

14        Q.   I have a very specific question.  How many

15   times were you improperly denied overtime that you

16   requested?

17        A.   I was denied the last week or two, the last

18   week that was needed to continue supporting the PIs.

19   The week before the task was taken from me.

20        Q.   Is it fair to say that was in August of

21   2000?

22        A.   Yes.

23        Q.   Is there any other instance in which you

24   were unfairly denied overtime?

```
 1        A.    In the first two weeks, in the first
 2   beginning of taking on the responsibilities, there
 3   were issues, because I already had -- what had
 4   happened, I was already working late, and the second
 5   week -- I'm trying to remember the time.  I don't
 6   know if there was a second week or the first week.
 7   I can't remember the actual sequence of what
 8   happened.  From what I understand, it might have
 9   been the second week when Martha wrote to me or
10   wrote to Dr. Poon letting him know that -- I think
11   it stopped then, something around that time.
12        Q.    Was this also in August of 2000,
13   approximately?
14        A.    I believe it was.
15        Q.    Is it fair to say the only time that you
16   were improperly denied overtime that's now the
17   subject of this charge of discrimination occurred in
18   August of 2000?
19        A.    I believe so, yes.
20        Q.    Why do you believe that that denial of
21   overtime was racially discriminatory?
22        A.    Well, I believe the other employees that
23   were working overtime did not -- there was no
24   request for a work log to be provided.  I never had
```

```
 1   issues, because the work log would have shown that I
 2   was working later than an eight-hour day.
 3         Q.   A yes or no question.  Did you obtain the
 4   approval of the administrative officer before you
 5   worked the overtime hours that you claim you were
 6   improperly denied in August of 2000?
 7         A.   No, I did not get her approval.  I was just
 8   working.
 9         Q.   You also allege that the investigation
10   conducted by Regina Caines to your internal
11   grievance was unfair; is that correct?
12         A.   Yes, I did.
13         Q.   Did you believe her internal grievance was
14   discriminatory?
15         A.   I believe it was.
16         Q.   In that internal grievance that you raised
17   with Ms. Caines, is it fair to say that you brought
18   your internal grievance to her on August 31, 2000?
19         A.   No.  I brought it to her before that.  But
20   it was a rough draft when I originally brought it to
21   her.  Then I finished a final copy of it.
22              How the procedure was going, how she made
23   me aware of it, I met with her and showed her a
24   rough draft of my grievance during the time I was
```

1   doing these additional responsibilities.  Then on

2   August 31 I finished a final copy and gave it to

3   her.  From what I understand, she had initially

4   started doing the investigation after I gave her the

5   rough draft, internal grievance.

6        Q.   Is it fair to say as part of your internal

7   grievance that you raised with Ms. Caines, you

8   alleged that you had been unfairly required to

9   support additional PIs, unfairly given additional

10  work assignments?

11       A.   Yes, I did.

12       Q.   And that you allege that you had been

13  unfairly questioned about working overtime and that

14  you had been unfairly restricted from getting

15  overtime pay and working overtime?

16       A.   I didn't say getting overtime pay, because

17  I did receive the overtime pay that I did work prior

18  to taking out my grievance.  I said it was unfair to

19  me that I was continuing to work -- needed to

20  continue to work to cover these additional PIs that

21  I would not be allowed to do the additional time.

22       Q.   Let me clarify that.  The overtime that you

23  worked in August of 2000, you were, in fact,

24  compensated and given overtime pay for working those

```
 1   hours, correct?
 2        A.   Yes, I was given pay for that, yes.
 3        Q.   You were given overtime pay for that,
 4   correct?
 5        A.   Yes.
 6        Q.   Back to Ms. Caines' investigation.  You
 7   alleged in your internal grievance that you raised
 8   with Ms. Caines that you had been unfairly required
 9   to support additional PIs, correct?
10        A.   Correct.
11        Q.   That you had been unfairly questioned about
12   working overtime, correct?
13        A.   Correct.
14        Q.   And that you had been unfairly asked to
15   submit work logs by Dr. Gray, correct?
16        A.   Correct.
17        Q.   And also that you had concerned about your
18   advancement and unfairly denied a promotion that was
19   promised to you by Mr. Malone, correct?
20        A.   Correct.
21        Q.   And you alleged that all of these instances
22   were evidence of racial discrimination, correct?
23        A.   I believe so, yes, in my mind.
24        Q.   And you believed at that time that racial
```

**Tab C**

1

Volume I
Pages 1 to 140
Exhibits 1 to 31

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                              :
DENISE SMALL,                 :
            Plaintiff,        :
                              :
        vs.                   :   Civil Action No.
                              :   04 12210 NG
MASSACHUSETTS INSTITUTE OF     :
TECHNOLOGY,                    :
            Defendant.         :
                              :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF MARTHA GRAY, a witness called
on behalf of the Plaintiff, taken pursuant to the
Federal Rules of Civil Procedure, before Susan J.
Cataldo, Professional Shorthand Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Hale and Dorr Legal Services
Center of Harvard Law School, 122 Boylston Street,
Jamaica Plain, Massachusetts, on Tuesday, December
6, 2005, commencing at 11:09 a.m.

PRESENT:

    Hale and Dorr Legal Services Center of Harvard
        Law School
        (by Stephen S. Churchill, Esq.)
        122 Boylston Street,
        Jamaica Plain, MA 02130, for the Plaintiff.

    Edwards Angell Palmer & Dodge LLP
        (by Robert G. Young, Esq.)
        111 Huntington Avenue,
        Boston, MA 02199, for the Defendant.

                * * * * *

64

1   complaining, and complaining may even be too strong

2   a word for a discussion that was one of it could

3   have been, "How's your job going?" I don't remember

4   any specific incident or particular time.

5       Q.   Okay.  So you don't remember any incident

6   that precipitated her indicating to you that she had

7   too much to do?

8           MR. YOUNG:  Objection.

9       A.   I don't remember anything specific at the

10  moment, no.

11      Q.   All right.  And you never requested any

12  other support staff to prepare a work log; is that

13  correct?

14      A.   As I said, I've used that technique in my

15  lab for students and staff.  I believe that's the

16  only time I've done it in the context that I just

17  did.

18      Q.   When you say that's the only time you've

19  done it, do you mean with Ms. Small or did you mean

20  something else?

21      A.   Oh, no.  I don't remember doing it with any

22  other employee, you know, other than in my research

23  laboratory.

24      Q.   Okay.  Now, people in a research laboratory

**Tab D**

1

Volume I
Pages 1 to 93
Exhibits 32 to 41

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
DENISE SMALL,                    :
          Plaintiff,             :
                                 :
     vs.                         :   Civil Action No.
                                 :   04 12210 NG
MASSACHUSETTS INSTITUTE OF       :
TECHNOLOGY,                      :
          Defendant.             :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF REGINA A. CAINES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Susan
J. Cataldo, Professional Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Hale and Dorr Legal
Services Center of Harvard Law School, 122 Boylston
Street, Jamaica Plain, Massachusetts, on Thursday,
December 15, 2005, commencing at 10:04 a.m.

PRESENT:

    Hale and Dorr Legal Services Center of
        Harvard Law School
        (by Stephen S. Churchill, Esq.)
        122 Boylston Street,
        Jamaica Plain, MA 02130, for the Plaintiff.

    Edwards Angell Palmer & Dodge LLP
        (by Robert  G. Young, Esq.)
        111 Huntington Avenue,
        Boston, MA 02199,
        for the Defendant.

                * * * * *

19

1      A.   Yes.

2      Q.   All right.  What does HST stand for?

3      A.   I don't even remember that.

4      Q.   Okay.  So did HST develop an annual

5   affirmative action plan?

6      A.   As part of the division that they were part

7   of.  I don't think HST is a separate division or a

8   separate school, but within -- I think it's the

9   School of Science.  I'm not sure any more.

10      Q.   Okay. So it's your memory HST did not

11   prepare its own affirmative action plan?

12      A.   Not -- I did not collect data specific to

13   HST for the affirmative action plan.  It would have

14   been part of a compilation of information that came

15   from their school.

16      Q.   Okay.  How many different affirmative

17   action plans were there on any given year?

18          MR. YOUNG:  Objection.

19      A.   Plans.  There was one affirmative action

20   plan.

21      Q.   Okay.  How many --

22      A.   In any given year.

23      Q.   -- departments or divisions were there?

24          MR. YOUNG:  Objection.