UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENISE SMALL,

                Plaintiff,

v.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY,

                Defendant.

Civil Action No. 04-12210-NG

**MEMORANDUM IN SUPPORT OF MASSCHUSETTS INSTITUTE OF TECHNOLOGY'S MOTION FOR SUMMARY JUDGMENT**

Defendant Massachusetts Institute of Technology ("MIT") terminated the employment of plaintiff Denise Small ("Plaintiff") for insubordination after she refused, over a period of five weeks, to meet with one of her supervisors despite repeated requests to do so. Plaintiff now asserts claims against MIT for discrimination and retaliation under federal and state law. However, there is no evidence to suggest that discriminatory or retaliatory animus played any role in any action taken with respect to her, particularly with respect to her termination, which is the sole cognizable adverse action in this case. Accordingly, MIT is entitled to summary judgment on all of Plaintiff's claims.

**Undisputed Material Facts[1]**

After employing Plaintiff in a temporary capacity for several months, MIT hired Plaintiff on a permanent basis as a Senior Secretary in the Harvard-MIT Division of Health Sciences and Technology ("HST") in September 1998; she replaced a Caucasian female. In this position, Plaintiff provided part-time secretarial, grant and research account support for Dr. Chi-Sang Poon and part-time grant and research account support for several other HST Principal Investigators ("PI"), including Drs. Jim Weaver and Martha Gray. Dr. Poon's and Dr. Weaver's grant funding each covered 20% of Plaintiff's salary, while HST covered the remaining 60%, which paid for the

---

[1] The facts are taken from Defendant's Statement of Undisputed Facts ("Stmt."), which is incorporated by reference.

secretarial support that Plaintiff provided Dr. Poon and the grant and research support that she provided to other PI's. (Stmt. at ¶¶ 1-7.)

### *As a Senior Secretary, the HST AO always was one of Plaintiff's supervisors.*

Although Plaintiff worked for multiple PI's, the HST Administrative Officer ("AO") was her immediate supervisor. This supervisory arrangement, which was set forth in Plaintiff's job description, was consistent with the AO's role as manager of HST and Plaintiff's salary funding, the majority of which came from HST. Robert Malone, as AO, signed the Request for Personnel Form for Plaintiff's position because he was the position's supervisor, and Plaintiff admits that her job was "set up to . . . report to" the HST AO. Indeed, prior to accepting the position, Plaintiff met with Mr. Malone to discuss the job's description and duties. Plaintiff believes that Mr. Malone had input into her hiring as Senior Secretary; in fact, Mr. Malone requested that Plaintiff be hired for the position. (Stmt. at ¶¶ 8-13.)

The nature of the supervisory relationship for Plaintiff's position was summarized further in performance evaluations she received from Mr. Malone where he wrote: "Denise occupies a position of unique responsibilities . . . . [S]he has, informally, several 'supervisors', even though her actual reporting responsibility is to the Administrative Officer of HST." Consistent with that relationship, Mr. Malone provided Plaintiff with performance reviews and Plaintiff believed that he had the authority to grant her a promotion or a raise. Further, as AO Mr. Malone was required to approve Plaintiff's requests for overtime and her requests to take continuing education courses. (Stmt. at ¶¶ 17-19.)

### *Plaintiff's job tasks and overtime work.*

Among Plaintiff's job requirements was assisting the PI's whom she supported with the administration of their grants. Until July 2000, Plaintiff performed miscellaneous tasks in support of

2

a Biomedical Internship Program that was funded by a grant that had been awarded to Dr. Gray. When Plaintiff's responsibilities for the Internship Program ended, Dr. Gray asked her to take on some temporary, and minor, tasks that had been performed by another HST secretary who was on medical leave. These tasks (which Plaintiff acknowledges lasted "for only . . . [t]wo or three weeks") consisted of checking HST PI Irving London's mail and providing minimal assistance to another HST PI, Jane-Jane Chen. Dr. Gray believed that the assumption of these tasks would be a routine undertaking and that Plaintiff had the time to perform them. To confirm this, and in order to understand the allocation of how Plaintiff was, in fact, devoting her workplace efforts, Dr. Gray asked Plaintiff to compile brief, summary work logs. Dr. Gray asked Plaintiff to complete a total of three work logs during the summer of 2000. Plaintiff did not consider Dr. Gray's first two requests to be unfair. Plaintiff spent approximately 25-35 minutes creating each work log, and "combined all together, it could have taken [her] maybe an hour and a half, maybe an hour" to complete all of the work logs. (Stmt. at ¶¶ 22-35.)

During the summer of 2000, Plaintiff also assumed some additional responsibilities that were neither required nor requested by her supervisors. For instance, she took it upon herself to install a new mailbox system for the laboratories of Dr. London and neighboring PI's – an act for which she sought 12 hours of overtime pay after she had performed the work. Although Plaintiff violated HST policy by working overtime without first obtaining authorization to do so, she was paid in full for all overtime hours that she reported. (Stmt. at ¶¶ 36-37.)

*Plaintiff's internal grievance did not uncover any evidence of discrimination.*

Plaintiff filed a grievance dated August 21, 2000 with MIT's Affirmative Action Office, alleging that she was being discriminated against because: (i) she had been given "additional" work assignments; (ii) she had been questioned about working overtime that was not pre-authorized; and

3

(iii) she was asked to submit work logs.  During the investigation that followed, Plaintiff also expressed concern that a 1999 request to the HST AO for a change in her job title and salary had not been granted.  Regina Caines, MIT's Affirmative Action Officer, investigated Plaintiff's grievance; Ms. Caines interviewed all of the "key individuals whose responsibilities in HST [were] relevant to the issues raised by [Plaintiff]" and all people "named by [Plaintiff] as parties important to the circumstances she reported."  In January 2001, Ms. Caines issued a final report concluding that her investigation "did not uncover evidence of discrimination."[2]  At the time she received Ms. Caines's report, Plaintiff considered the report itself to be "just another mechanism turned against [her] in the form of discrimination."  (Stmt. at ¶¶ 39-46.)

### *Plaintiff's employment was terminated after she repeatedly refused to meet with Ms. Judge.*

When Ms. Judge began working as the HST AO in November 2001, she endeavored to meet with "as many members of the HST community as [she] could" in order "to get to know HST and . . . how it worked."  Ms. Judge eventually conducted approximately 30 to 40 such meetings.  They were held on a regular basis throughout the first few months of her employment, beginning with "more senior administrators to talk about their areas of responsibilities . . . [and t]hen [with other] . . . people in their areas to find out at the next level of detail how people worked."  Prior to attempting to meet with Plaintiff, Ms. Judge already had held introductory meetings with approximately 15-20 employees (support staff, administrators and faculty members alike) in which she discussed their roles within HST.  Before scheduling these meetings, Ms. Judge consulted with her colleagues, including Dr. Gray, in order to get a general sense of what people's jobs were and who she should meet with.  Among the people that Dr. Gray mentioned was Plaintiff, because HST paid for the

---

[2] Even so, in response to Plaintiff's complaint, Dr. Gray removed from Plaintiff the responsibility for the alleged "extra" tasks as of mid-September 2000 and hired a temporary employee to perform them.  Stmt. at ¶ 48.

4

majority of Plaintiff's salary and, pursuant to Plaintiff's job description, she reported to the AO. Dr. Gray made no mention of Plaintiff's 2000 grievance and prior to attempting to meet with Plaintiff, Ms. Judge had no knowledge that Plaintiff had ever filed a grievance. (Stmt. at ¶¶ 58-63, 68.)

Because Ms. Judge learned that Plaintiff reported to the AO, she requested the job description for Plaintiff's position from the HST personnel administrator, Terrill Gadde. This job description stated that the "position is technically supervised by the several scientist/researchers to which support is provided, but reports to the Division Administrative Officer." Ms. Judge also obtained job descriptions for the other HST employees who directly reported to her, and she held meetings with each of those individuals in which she discussed their job responsibilities and asked them if their job description was accurate. Because of Plaintiff's job description and their reporting relationship, Ms. Judge would have scheduled a meeting with her regardless of Dr. Gray's recommendation that she do so. (Stmt. at ¶¶ 64-67.)

In late January 2002, Ms. Judge approached Plaintiff in an attempt to set up a meeting to discuss Plaintiff's job duties. Ms. Judge showed Plaintiff a copy of the job description that she had obtained from Ms. Gadde. Plaintiff responded that she had a different job description and had never seen the one that Ms. Judge was showing her; however, when Ms. Judge asked to see the job description that Plaintiff claimed she had, Plaintiff refused and instead directed Ms. Judge to the MIT personnel office.[3] In fact, the different job description that Plaintiff claims she had at that time, which actually was the job requisition form, also identified the HST AO as her "[i]mmediate supervisor." (Stmt. at ¶¶ 69-73.)

On January 23, Plaintiff left Ms. Judge a voicemail message canceling a meeting they had scheduled to discuss Plaintiff's job responsibilities. Ms. Judge called Plaintiff back to reschedule the

---

[3] Ms. Judge subsequently spoke with a representative of MIT's Human Resources Office, who informed her that there was no different job description for Plaintiff in the general Human Resources file. Stmt. at ¶ 72.

5

meeting and again requested that Plaintiff bring a copy of the job description she claimed to have to the rescheduled meeting. Plaintiff then accused Ms. Judge of harassing her, and Ms. Judge ended the telephone call. (Stmt. at ¶¶ 74-77.)

On January 24, Plaintiff emailed Ms. Judge claiming that she did not feel "safe" meeting with Ms. Judge unless she could either record the meeting or have someone else present. The next day, Ms. Judge explained that she had requested Plaintiff's job description merely "to be sure that [they] were both working from the same set of information." Ms. Judge also agreed to "honor [Plaintiff's] request that Dr. Poon be present at the meeting," and she informed Plaintiff that a representative from MIT's Human Resources ("HR") Office would attend as well.[4] (Stmt. at ¶¶ 78-80.)

On January 28, Plaintiff sent Ms. Judge an email denying that the HST AO was a supervisor of hers and declaring that she would meet with Ms. Judge only on the basis that Ms. Judge was not one of her supervisors. A few days later, Plaintiff emailed Ms. Judge and declared that she would not attend a meeting that Ms. Judge had scheduled because she needed to work on a grant proposal for Dr. Poon. Plaintiff also stated that she "discussed this with Dr. Poon and he doesn't agree to any meeting involving HR." Again, Plaintiff asserted that she considered Dr. Poon to be her supervisor, and she referred Ms. Judge to him to set up any future meeting. (Stmt. at ¶¶ 84-86.)

In response to this email from Plaintiff, Dr. Gray – the co-Director of HST – emailed Plaintiff and told her that it was "paramount" that she meet with Ms. Judge and "essential that [she] develop a good working relationship with Ms. Judge." Dr. Gray also explained to Plaintiff she was "concerned" that Plaintiff claimed that she did not feel safe meeting with Ms. Judge, and therefore a representative from MIT's HR Office would attend the meeting with Ms. Judge "to ensure that [Plaintiff had] no cause to fear for [her] safety." Plaintiff understood Dr. Gray's email to mean that

---

[4] Ms. Judge also informed Plaintiff that a meeting that they had scheduled for January 28 would have to be postponed because of a scheduling conflict on the part of the HR representative. Stmt. at ¶ 82.

6

"it was necessary that [she meet with Ms. Judge, that she] need[ed] to."[5]  (Stmt. at ¶¶ 87-91.)

The next day, February 6, Plaintiff sent Dr. Gray an email again claiming that she never previously reported to the HST AO and therefore she believed she had "ample reason to not feel safe in any discussions with the HST Administration."  On February 7, Dr. Gray sent Plaintiff an email reiterating that it was "important" that she meet with Ms. Judge; Dr. Gray provided two dates and times for the meeting[6] and instructed Plaintiff to contact Ms. Judge to set up the meeting.  Despite this clear instruction, Plaintiff never contacted Ms. Judge directly to discuss the meeting dates.  Instead, later in the day on February 7 Dr. Gray and Ms. Judge received an email from Dr. Lois Eichler of MIT Medical requesting that Plaintiff be given "some time away from work" – which time ended up being a two week leave of absence that MIT granted her.  (Stmt. at ¶¶ 92-97.)

On February 22, after Plaintiff had been back at work for two days, Ms. Judge sent Plaintiff an email to set up a meeting at 10:00 a.m. on the following Monday, February 25, and she informed Plaintiff that failure to attend this meeting would be cause for disciplinary action.  Later in the day on February 22, Ms. Judge received an email from MIT Medical stating that Plaintiff had been encouraged to go home and not return to work that day.  Plaintiff did not attend the February 25 meeting and never informed Ms. Judge that she would not attend the meeting.  (Stmt. at ¶¶ 98-100.)

On February 26, Ms. Judge sent Plaintiff a letter in which she issued Plaintiff a written warning for her failure to attend the February 25 meeting.  The letter also informed Plaintiff that if she did not contact Ms. Judge by February 28, she would be terminated for insubordination, absent mitigating circumstances.  Because Plaintiff was not at work on February 26, and had not informed

---

[5] In 2000, Mr. Malone similarly met with Plaintiff at Dr. Gray's instruction to "develop a clearer picture of how [her] time [was being] allocated." Stmt. at ¶ 89. Plaintiff did not consider this request to be "unfair in any way," and she complied with it because "[a]s a reporting supervisor, [Mr. Malone's request was] reasonable." Stmt. at ¶ 90.

[6] A meeting with Ms. Judge that had been scheduled for February 6 had to be postponed because Ms. Judge was out sick that day. Prior to the time the meeting was to occur, Ms. Judge caused a message to be sent to Plaintiff informing her of the need to reschedule and proposing two alternate dates. Stmt. at ¶ 93.

Ms. Judge of her whereabouts, Ms. Judge had the letter delivered to Plaintiff's home. At the time she sent the letter to Plaintiff's home, Ms. Judge did not know that Plaintiff was out sick. Plaintiff responded to the letter the next day by sending an email to Ms. Judge in which she claimed that sending a letter to her home was "unacceptable" and unambiguously declared that she "will not meet with [Ms. Judge] under any circumstances." (Stmt. at ¶¶ 101-105.)

In a letter dated March 4, Dr. Gray and Dr. Bonventre, the other co-Director of HST, reiterated that Plaintiff was expected to meet with Ms. Judge. Plaintiff was told that her assertion that she would not meet with Ms. Judge under any circumstances was "not acceptable behavior for an MIT employee." Plaintiff was given until the close of business on March 4 to revoke in writing her assertion that she would not meet with Ms. Judge under any circumstances and, if she failed to do so, she would be terminated. Plaintiff understood after receiving this letter that her employment would be terminated if she continued to refuse to meet with Ms. Judge. (Stmt. at ¶¶ 106-109.)

In response to the March 4 letter, Plaintiff emailed Dr. Gray and again denied that Ms. Judge was her supervisor; Plaintiff claimed that she would be willing to meet with Ms. Judge only "when Dr. Poon can be available and when the above circumstances [regarding the supervisory structure of Plaintiff's position in HST] have been clarified." The next day, March 5, Dr. Gray sent Plaintiff an email again reiterating that Plaintiff was expected to meet with Ms. Judge. Dr. Gray acknowledged that Ms. Judge had agreed to Plaintiff's request that Dr. Poon be permitted to attend the meeting, but noted that his unavailability was one of the reasons why the meeting with Ms. Judge had not occurred. Dr. Gray instructed Plaintiff to arrange a time to meet with Ms. Judge on either March 5 or March 6, whether with Dr. Poon, with another MIT colleague, or alone. (Stmt. at ¶¶ 110-114.)

Plaintiff did not contact Ms. Judge to arrange a meeting, as she had been instructed to do; instead, in an email to Dr. Gray on March 6, Plaintiff asserted that "[a]s for the meeting with Maria

8

Judge, I will defer to Dr. Poon, my direct supervisor." In this email, Plaintiff again denied that the HST AO was one of her supervisors and informed Dr. Gray that in order for Plaintiff to consider Ms. Judge a supervisor, Dr. Gray "would have to discuss [the matter] with Dr. Poon first." In light of her repeated refusals to meet with Ms. Judge, MIT terminated Plaintiff's employment as of March 7, 2002. (Stmt. at ¶¶ 115-117.)

Plaintiff admits that it was appropriate for Ms. Judge to want to meet with her, and that Ms. Judge could have had a good faith belief that she was one of Plaintiff's supervisors. Stmt. at ¶ 118. Plaintiff acknowledges that "it is an essential function of any job for an employee to meet with the person that she reports to if that person . . . requests a meeting." Stmt. at ¶ 119. Dr. Gray and Ms. Judge directed Plaintiff to attend such a meeting on numerous occasions, and Plaintiff "underst[ood] from the very beginning" that she was expected to meet with Ms. Judge and that failure to do so was insubordination. Stmt. at ¶ 120. Plaintiff now claims that she did not care for the "manner" in which Ms. Judge initially approached her, thus causing Plaintiff to refuse to meet with her; Plaintiff concedes that had Ms. Judge approached her in a manner that Plaintiff deemed acceptable, she "would not have found any problems" with Ms. Judge's request for a meeting."[7] Stmt. at ¶ 121.

### Argument

Summary judgment is appropriate when the moving party has established that there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Because Plaintiff has proffered no direct evidence of discriminatory animus, her discrimination claims must be analyzed under the traditional three-stage burden shifting paradigm. First, Plaintiff must establish a *prima facie* case of discrimination by showing (1) that she was a member of a protected class; (2) that she was performing her job adequately; (3) that she

---

[7] In fact, Plaintiff has a history of losing or leaving jobs because of her belief that supervisors approached her inappropriately or made improper requests of her or otherwise treated her unfairly. Stmt at ¶ 122.

9

suffered an adverse employment action; and, as to her termination, (4) that MIT sought an equally-qualified replacement for her. *See Benoit* v. *Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). If a *prima facie* case is established, MIT must produce a legitimate, nondiscriminatory reason for its action. *See id.* at 174. It is Plaintiff's ultimate burden to prove that this asserted reason is a pretext and that discriminatory animus was the real reason for the adverse employment action.[8] *See id.* at 174. Similarly, with respect to her retaliation claims, Plaintiff must prove that (1) she engaged in protected activity; (2) MIT was aware of that protected activity; (3) she suffered an adverse employment action; and (4) a causal connection exists between her protected activity and the adverse employment action. *See id.* at 175.

## I. MIT TERMINATED PLAINTIFF'S EMPLOYMENT BECAUSE SHE REFUSED TO MEET WITH ONE OF HER SUPERVISORS DESPITE REPEATED REQUESTS TO DO SO.

Plaintiff complains of only one actual adverse employment action[9] – the termination of her employment. However, the record is utterly devoid of evidence to show that discriminatory or retaliatory animus was a determinative factor for this adverse employment action. Accordingly, Plaintiff's claims of discrimination and retaliation fail as a matter of law.

### A. Plaintiff's termination was not motivated by discriminatory animus.

Even assuming that Plaintiff can establish a *prima facie* case of race discrimination concerning her termination, the record demonstrates that MIT terminated Plaintiff because she repeatedly refused meet with one of her supervisors, Ms. Judge. Plainly, this is a legitimate, nondiscriminatory reason for this action, and there is not a shred of evidence in the record to suggest

---

[8] Although Plaintiff has asserted claims of discrimination under Title VII, G.L. c. 151B and 42 U.S.C. § 1981, all should be analyzed under the same three-stage burden shifting framework. *See Benoit*, 331 F.3d at 173 (Title VII burden-shifting framework applicable to claims under G.L. c. 151B); *Straughn* v. *Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001) (discrimination claims under 42 U.S.C. § 1981 analyzed under Title VII standards).

[9] Plaintiff's other allegations are untimely and/or amount to, at best, mere inconveniences that are not adverse employment actions and in any event were not motivated by discriminatory or retaliatory animus. *See* Part II, *infra*.

that this reason merely is a pretext for discrimination. *See Straughn*, 250 F.3d at 34 (plaintiff must "show that the reason was a coverup for a discriminatory decision") (internal quotations omitted).

As an initial matter, the record clearly demonstrates that it was reasonable for MIT to conclude that Plaintiff refused to meet with Ms. Judge.[10] In fact, on no fewer than five occasions Plaintiff concocted thin excuses and, at times, outright fabrications to avoid meeting with Ms. Judge. On January 28, 2002, Plaintiff stated that she would only meet with Ms. Judge on the understanding that Ms. Judge was not one of her supervisors. On February 5, Plaintiff cancelled a meeting that Ms. Judge had scheduled and asserted that Dr. Poon, and therefore she, would not agree to any meeting with Ms. Judge that included a representative from MIT's HR office;[11] Plaintiff also improperly directed Ms. Judge to schedule any future meeting between them through Dr. Poon. On February 27, Plaintiff flatly declared that she would not meet with Ms. Judge "under any circumstances." Stmt. at ¶ 105 (emphasis added). On March 5, in response to a direct instruction from the co-Directors of HST that she meet with Ms. Judge, Plaintiff asserted that she would not meet with Ms. Judge until the supervisory structure of her position had been clarified. Finally, on March 6, in response to another explicit direction from Dr. Gray that Plaintiff needed to contact Ms. Judge directly to schedule a meeting, Plaintiff again claimed that Dr. Poon, and not Ms. Judge, was her supervisor and that she would therefore "defer to Dr. Poon" with respect to scheduling a meeting with Ms. Judge; Plaintiff never contacted Ms. Judge as directed. Thus, the record demonstrates that Plaintiff refused numerous times, with increasingly defiant rhetoric, to meet with Ms. Judge.

---

[10] Although the record evidence overwhelmingly demonstrates that Plaintiff, in fact, repeatedly refused to meet with Ms. Judge, MIT need only show that it *reasonably believed* that Plaintiff refused to meet with Ms. Judge to justify her termination. *See Straughn*, 250 F.3d at 41 (in pretext analysis, the focus "must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible") (internal quotations omitted).

[11] Any claim that Plaintiff was treated unfairly because an MIT HR representative planned to attend her meeting with Ms. Judge is baseless. Plaintiff accused Ms. Judge of harassment and claimed that she did not "feel safe" meeting with Ms. Judge. Stmt. at ¶ 78. Ms. Judge thus sought guidance from MIT's HR department, which reasonably recommended that an HR representative be present at her meeting with Plaintiff.

Similarly, the record clearly shows that Plaintiff was not subjected to disparate treatment in being asked to meet with Ms. Judge.[12] Ms. Judge met with each HST employee who directly reported to her and conducted between 30 and 40 introductory meetings in total, with both Caucasian and non-Caucasian employees, just like the one that she attempted to arrange with Plaintiff. Given Ms. Judge's actions, there is no basis upon which Plaintiff can sustain her claim that she was treated unfairly, let alone that she was discriminated against because of her race. *See Benoit*, 331 F.3d at 174 (affirming grant of summary judgment to employer where plaintiff did not "show[] that any other similarly situated employee was treated differently").

Plaintiff stakes the bulk of her claim on the revisionist, and demonstrably incorrect, assertion that the HST AO was not one of her supervisors and therefore she was under no obligation to meet with Ms. Judge on that basis. Plaintiff's own testimony directly contradicts this assertion. When she was hired as a Senior Secretary position, Plaintiff knew that Mr. Malone, as HST AO, signed the Request for Personnel Form for the position because he was the position's supervisor and that her job was "set up to . . . report to" the AO. Stmt. at ¶ 13. This indisputable fact highlights the insubordinate nature of Plaintiff's refusal to meet with Ms. Judge, Mr. Malone's successor as HST AO, despite Ms. Judge's (and the HST co-Directors') repeated insistence that she do so.

Further, both the job description for Plaintiff's position and her prior interactions with HST AOs vitiate her assertion that the HST AO was not one of her supervisors. The job description for Plaintiff's position clearly states that Plaintiff "reports to the Division Administrative Officer." Stmt. at ¶ 65. Further, the job description that Plaintiff claims to have had at the time Ms. Judge sought to

---

[12] Plaintiff also cannot claim that MIT committed unlawful harassment by attempting to schedule a routine meeting. Ms. Judge made multiple attempts to schedule the meeting. When Plaintiff asserted that her mental health required her to take time away from work, MIT respected that request completely. Only after Ms. Judge learned that Plaintiff had been cleared to return to work did she again seek to schedule their meeting. Although Plaintiff made a sensationalized claim that, by sending a letter to her home, Ms. Judge purportedly was "stalking" her, Plaintiff acknowledges that when Ms. Judge sent that letter, Plaintiff had not told Ms. Judge, Dr. Gray or anyone in the HST administration that she was on sick leave or medically unable to come to work. Stmt. at ¶¶ 100, 104.

arrange a meeting with her also lists the HST AO as her "Immediate Supervisor." Stmt. at ¶ 73. Even Plaintiff admits that, looking at those job descriptions, Ms. Judge could have had a good faith belief that she was one of Plaintiff's supervisors. *Id.* at ¶ 118. Ms. Judge's reasonable, and accurate, belief is buttressed by the numerous instances of supervisory authority that AO's exercised over Plaintiff in the course of her employment at HST. In particular, one of Ms. Judge's predecessors as AO (Mr. Malone) met with Plaintiff at Dr. Gray's request in 2000 to "develop a clearer picture of how [her] time [was being] allocated." Stmt. at ¶ 89. Plaintiff did not deem Mr. Malone's request "unfair in any way," and she complied with the request because "[a]s a reporting supervisor, [Mr. Malone's request was] reasonable." Stmt. at ¶ 90.

Thus, Plaintiff cannot now claim that Ms. Judge's requests to meet with her, as her supervisor, were in any way unreasonable. Plaintiff admits that she "underst[ood] from the very beginning" that she was expected to meet with Ms. Judge and that failure to do so was insubordination. Stmt. at ¶ 120. Although Plaintiff now claims that she considered the "manner" in which Ms. Judge first approached her and asked her to discuss her job description was inappropriate – an allegation that MIT denies – even she admits that Ms. Judge's request to meet was reasonable. Further, as early as February 5, 2002 – over one month before her employment was terminated – Dr. Gray, a co-Director of HST and someone Plaintiff also considered a supervisor, emphasized to Plaintiff that "it [was] paramount that [she] meet with Ms. Judge to discuss [her] job responsibilities" and that it was "essential that she develop a good working relationship with [Ms. Judge]." Stmt. at ¶ 87. Plaintiff understood that "it was necessary that [she meet with Ms. Judge, that she] need[ed] to." Stmt. at ¶ 88. Nonetheless, she continued to deliberately refuse to attend a routine meeting, going as far as to declare on February 27 that she would not meet with Ms. Judge "under any circumstances." Stmt. at ¶ 105. Plaintiff persisted in refusing to meet with Ms. Judge, even after she understood that

13

her employment would be terminated if she refused to meet cooperatively with Ms. Judge. Stmt. at ¶ 109. This blatant insubordination – and not her race – was the determinative cause of Plaintiff's discharge from employment. Accordingly, Plaintiff's claim of discriminatory discharge must be dismissed. *See Tate* v. *Dept. of Mental Health*, 419 Mass. 356, 358, 363-64 (1995) (plaintiff lawfully discharged for insubordination because she "refused to recognize [her] unit chief as her supervisor").

      **B.**    **Plaintiff's termination was not motivated by retaliatory animus.**

Similarly, Plaintiff's termination cannot form the basis of a claim of retaliation. Plaintiff has asserted two protected activities in this case: filing her internal grievance of discrimination in August 2000 and filing a charge with the MCAD in February 2002. However, there is not an iota of evidence to even hint that Plaintiff's termination was causally connected to either of those events. Plaintiff's employment was terminated because she repeatedly refused to meet with Ms. Judge, and there is no evidence to suggest that any protected activity played any role in this decision. *See Lewis* v. *Gillette Co.*, 22 F.3d 22, 24 (1st Cir. 1994) (plaintiff "must establish the basic fact that he was subjected to an adverse employment action *because* of his protected activity") (emphasis in original). Further, with respect to her internal grievance, the substantial distance in time between her grievance (dated August 2000) and her termination (March 2002) simply is too great to warrant an inference of retaliation. *See Benoit*, 331 F.3d at 175 (affirming grant of summary judgment in favor of employer where protected activity occurred over a year before adverse employment action); *Dressler* v. *Daniel*, 315 F.3d 75, 80 (1st Cir. 2003) ("the inference of a causal connection becomes more tenuous with time"). Moreover, Ms. Judge did not even know about Plaintiff's internal grievance before she first requested a meeting with Plaintiff, which conclusively breaks the link between her prior grievance and her claim that the request for such a meeting, which led to her termination, was retaliatory. *See Lewis*, 22 F.3d at 24 ("At a minimum, there must be competent evidence that the alleged retaliators knew of the plaintiff's protected activity and that a retaliatory motive played a part

in the adverse employment actions alleged.")

Similarly, the mere fact that Plaintiff filed a charge with the MCAD prior to her termination cannot salvage her retaliation claim. Indeed, Plaintiff was given a final written warning <u>prior</u> to filing her MCAD charge and was notified at that time that "further refusal to meet with [Ms. Judge], or failure to show for a scheduled appointment, will be grounds for termination from employment." Stmt. at ¶ 101. That MIT carried through with its actions after Plaintiff filed a charge with the MCAD does not create a claim for retaliation. *See Clark County Sch. Dist.* v. *Breeden*, 532 U.S. 268, 272 (2001) (per curiam) (employer "proceeding along lines previously contemplated . . . is no evidence whatever of causality"); *Mole* v. *University of Massachusetts*, 442 Mass. 582, 594 (2004) (where "problems with an employee predate . . . protected activity, it is not permissible to draw the inference that subsequent adverse actions . . . are motivated by retaliation"). Rather, Plaintiff's filing of an MCAD charge in this case was nothing more than a "smokescreen in challenge to the supervisor's legitimate criticism," which cannot support a claim for retaliation. *Pardo* v. *General Hosp. Corp.*, 446 Mass. 1, 23 (2006) (quoting *Montiero* v. *Poole Silver Co.*, 615 F.2d 4, 8 (1st Cir. 1980)). Consequently, because Plaintiff cannot show that her termination was causally connected to any protected activity that she engaged in, her retaliation claim fails.

**II.     PLAINTIFF'S REMAINING ALLEGATIONS FAIL TO SUPPORT A CLAIM OF DISCRIMINATION OR RETALIATION.**

   **A.     Plaintiff's earlier discrimination claims are time-barred.**

In addition to her termination, Plaintiff has raised various complaints about her work experience at MIT. Plaintiff claims that because of her race (1) she was "denied" a promotion in 1999; (2) MIT inappropriately added to her workload in 2000; (3) MIT improperly asked her to complete three work logs during the summer of 2000; (4) MIT improperly handled her internal complaint of discrimination in 2000. However, Plaintiff did not file her administrative charge of

discrimination on February 27, 2002 and therefore she cannot recover for alleged acts that occurred prior to May 3, 2001 with respect to her federal claims, and for any purported acts that occurred prior to August 27, 2001 with respect to her state law claims. 42 U.S.C. § 2000e-5; 2002 Mass. Acts c. 223, § 1 (administrative limitations period under G.L. 151B expanded to 300 days only for claims arising after November 5, 2002).[13] Accordingly, Plaintiff's allegations of discriminatory conduct which stem from discrete occurrences that preceded, and were the subject of, her internal grievance dated August 21, 2000 are well-beyond the administrative limitations period.[14] *See National RR Passenger Corp.* v. *Morgan*, 536 U.S. 101, 122 (2002) (discrete acts of alleged discrimination occurring outside administrative limitations period not actionable); *Ocean Spray Cranberries, Inc.* v. *MCAD*, 441 Mass. 632, 645 (2004) (discrete discriminatory act triggers administrative limitations period). All of her earlier claims (i.e., those concerning the 1999 "promotion" request, the work assignments and work logs in 2000 and the handling of her internal grievance) must be dismissed because they are untimely.

### B. Even if timely, Plaintiff's earlier discrimination claims are without merit.

Plaintiff's earlier discrimination claims, even if considered timely, simply do not amount to cognizable adverse employment actions, and therefore Plaintiff cannot establish even a *prima facie* claim of discrimination with respect to these claims. *See Benoit*, 331 F.3d at 173 (adverse employment action an essential element of *prima facie* case). "Typically, an adverse employment action involves a discrete change in the terms and conditions of employment (say, a discharge,

---

[13] Her claims under 42 U.S.C. § 1981 fare even worse – any purported § 1981 claim based on acts predating October 21, 2001 is untimely because she did not file her complaint until October 21, 2004. *See Joseph* v. *Wentworth Inst. of Tech.*, 120 F. Sup. 2d 134, 144 (D. Mass. 2000) (three-year statute of limitations for personal injury actions under Massachusetts law applies to § 1981 claims).

[14] Moreover, that Plaintiff failed to file an administrative complaint at the time she believed that discrimination was occurring further demonstrates the untimeliness of these claims. *See Vesprini v. Shaw Industries, Inc.*, 221 F. Supp. 2d 44, 54 (D. Mass. 2002) (continuing violation theory fails "if the plaintiff was or should have been aware that he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place") (internal quotations and citations omitted); *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 541 (2001).

demotion or reduction in pay)." *Noviello* v. *City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005); *MacCormick* v. *Boston Edison Co.*, 423 Mass. 652, 662-63 (1996) (adverse employment action requires some "disadvantage in respect to . . . salary, grade, or other objective term or condition of employment"); *cf. Burlington Northern & Santa Fe R.R. Co.* v. *White*, 548 U.S. __ (2006) (slip. op. at 7) (discrimination claims must be based on acts that "alter the conditions of the workplace"). None of Plaintiff's earlier allegations meet this necessary threshold.

Plaintiff's allegation that she was unfairly denied a promotion in 1999 does not state a cognizable claim of discrimination. Plaintiff did not apply for any available position, but instead inquired of the then-AO about obtaining an new job designation or pay increase. Stmt. at ¶ 42. Nobody was hired for a specific position instead of Plaintiff, and the AO did not, in fact, deny her a promotion but instead instructed her about how promotions generally were obtained. Stmt. at ¶ 42.

Further, the purported "teaching assistant" responsibilities assigned to Plaintiff for the Biomedical Internship Program were no more than secretarial duties, such as answering telephone inquiries and maintaining a database. Stmt at ¶ 26. These routine assignments were part of Plaintiff's job description in assisting Dr. Gray with grant-related matters. Stmt. at ¶ 27. Further, these tasks lasted for only a limited duration and took Plaintiff no more than 5.5 hours per week to complete. Stmt. at ¶ 28. Similarly, the supposed "extra" duties that Plaintiff was assigned at the end of July 2000 were merely minor, routine tasks which lasted less than a month. Stmt. at ¶¶ 29-30. Moreover, as a result of Plaintiff communicating her concerns about being assigned these duties, Dr. Gray hired a temporary employee to perform them. Stmt. at ¶ 48. Thus, neither assignment can be considered an adverse employment action.

The purported "denial" of overtime to Plaintiff also does not amount to an adverse employment action. Plaintiff admits that she was not actually "denied" overtime, but rather was

questioned in August 2000 for working overtime hours without first obtaining authorization. Stmt. at ¶ 38. Plaintiff concedes she was paid in full for working the overtime at issue. Stmt. at ¶ 37. Thus, there was no adverse employment action with respect to Plaintiff's overtime work.

In addition, Plaintiff's own testimony also undermines her claim that Dr. Gray's request that she create work logs was an adverse employment action. Plaintiff admits that she was asked to create only three weekly work logs and that even she did not consider Dr. Gray's request for the first two work logs to be unfair. Stmt. at ¶¶ 33-34. All three work logs were hardly a burden to create; it took Plaintiff approximately 25-35 minutes to create each log, and "combined all together, it could have taken [her] maybe an hour and a half, maybe an hour." Stmt. at ¶ 35.

Finally, Plaintiff's subjective disappointment about the outcome of MIT's internal investigation is not an adverse action upon which a claim can be based. Indeed, the investigation directly resulted in Dr. Gray addressing, and remedying, the workload concerns that Plaintiff had. Moreover, Plaintiff continued to work at MIT for over a year after she received Ms. Caines's final report. Although she disagreed with the investigation's outcome, the investigation did not result in any "disadvantage in respect to [her] salary, grade, or other objective term and condition of employment." *MacCormack*, 423 Mass. at 662-63. Because none of Plaintiff's earlier allegations amount to adverse employment actions, and because the record is devoid of any evidence to suggest that any of these actions were motivated by discriminatory animus, these claims must be dismissed.

> **C.  Plaintiff's timely allegations do not amount to adverse employment actions, and the record is utterly devoid of any evidence to suggest that these actions were caused by discriminatory or retaliatory animus.**

Plaintiff also has raised claims based on (1) a proposed move of her office space in December 2001; (2) having the duty of forwarding Dr. Weaver's DACCA payroll reports reassigned to a co-worker in February 2002; and (3) Dr. Weaver's purported lowering of performance evaluation delivered in February 2002. These claims do fall within the applicable limitations period, and

because they postdated her August 2000 internal grievance they could be alleged as discrimination, retaliation or both. However, even using the most lenient standard applicable (that for retaliation claims recently established by the United States Supreme Court), these additional claims fail because they are not adverse employment actions, and Plaintiff can make no showing that the now-challenged actions were motivated by either discriminatory or retaliatory animus. *See Burlington Northern & Santa Fe R.R. Co.* v. *White*, 548 U.S. __ (2006) (slip. op. at 13) (stressing the importance of "separat[ing] significant from trivial harms" when assessing claims of retaliation).

First, the proposed relocation of Plaintiff's office did not result in any adverse action because her office space never was moved. Plaintiff was never reassigned from working with Dr. Poon and when a potential office move was discussed, she was given a choice of three potential offices and asked which would be most acceptable to her. Stmt. at ¶¶ 56-57. This mere proposal cannot provide the basis for an actionable claim, and there is no evidence to suggest that discriminatory or retaliatory animus played any role in the proposal. *See Vesprini v. Shaw Industries, Inc*, 315 F. 3d 37, 42 (1st Cir. 2002) (assignment to a "small" office was not an "adverse employment action").

Second, the minimal nature of Plaintiff's DACCA-related duties for Dr. Weaver demonstrates that their removal from Plaintiff's responsibility was not an adverse employment action.[15] Plaintiff concedes that her DACCA responsibilities "didn't take much time at all," that they required attention on a bi-weekly basis, and that they "would take . . . 15 to 20 minutes . . . 30 minutes [at] the most" to complete. Stmt. at ¶ 51. Thus, transferring these duties was not a material adverse employment action. Further, Plaintiff has adduced no evidence that the reassignment of tasks was in any way related to her race or with her much earlier internal grievance.

Third, Plaintiff's allegation that Dr. Weaver lowered a 2001 performance evaluation is not

---

[15] There is no consistency to Plaintiff's allegations. Plaintiff alleges that it was improper to add to her workload by giving her additional tasks in 2000, but also that it was improper to reduce her workload by reassigning other tasks in 2001.

true.  Plaintiff believes that the quality of the work that she performed for Dr. Weaver in 2001 was of the same quality as the work that she did for him in 2000 and 1999 and that, accordingly, a comparable performance assessment should have resulted.  This is exactly what happened.  Dr. Weaver's performance evaluations for 1999, 2000 and 2001 bear a striking uniformity.  In Plaintiff's now-disputed 2001 review, Dr. Weaver gave her an overall performance rating that equated to a "highly effective" appraisal.  Stmt. at ¶ 54.  Dr. Weaver's 2000 and 1999 performance ratings also reflect an average appraisal that equals a "highly effective" rating.  Stmt. at ¶ 52.  In Dr. Weaver's "summary statement" for the now-disputed 2001 review, he deemed Plaintiff's work to be "[g]enerally very good."  Stmt. at ¶ 54.  His 2000 and 1999 summary statements describe Plaintiff's work as "overall very good!"  Stmt. at ¶ 52.  Plaintiff does not believe that Dr. Weaver discriminated against her, and the consistency of his reviews undermine her spurious claim that she suffered any adverse action, let alone one on which she could base a claim of racial discrimination or retaliation.  Consequently, this claim, along with Plaintiff's other claims, fails as a matter of law.

## Conclusion

For the foregoing reasons, MIT is entitled to summary judgment on all of Plaintiff's claims.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
By its attorneys,

/s/ Robert G. Young
Jeffrey Swope (BBO #490760)
Robert G. Young (BBO #650541)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue at Prudential Center
Boston, MA  02199-7613
617.239.0100

Dated: June 27, 2006

CERTIFICATE OF SERVICE
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 27, 2006.

/s/ Robert Young